IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **HALEY RODD,** | : | **CIVIL ACTION** |
| *Plaintiff* | : | |
| | : | **NO. 21-4987** |
| **v.** | : | |
| | : | |
| **PROGRESSIVE SPECIALTY INSURANCE CO.,** | : | |
| | : | |
| *Defendant* | : | |

NITZA I. QUIÑONES ALEJANDRO, J.                                                                                       FEBRUARY 18, 2025

# MEMORANDUM OPINION

**INTRODUCTION**

    Plaintiff Haley Rodd ("Plaintiff" or "Ms. Rodd") filed a complaint against Defendant Progressive Specialty Insurance Co. ("Defendant" or "Progressive") in state court in which she asserted claims for breach of a contract of insurance and bad faith, premised on Defendant's alleged failure to pay underinsured motorist benefits allegedly due to her as a result of injuries suffered in a motor vehicle accident. This case was removed to this court and tried without a jury. This Memorandum Opinion sets forth the Court's findings of fact and conclusions of law required under Federal Rule of Civil Procedure ("Rule") 52(a)(1).

**PROCEDURAL HISTORY**

    Plaintiff's state-court complaint asserted claims for underinsured motorist benefits and bad faith against Progressive and its agent, James McCoy ("McCoy"). (ECF 1-1). Progressive removed the action to this Court (*id.*) and then filed an answer. (ECF 5). McCoy filed a motion to dismiss, (ECF 4), which was granted, (ECF 7). Following the close of discovery, Progressive file a motion for partial summary judgment, seeking only the dismissal of Plaintiff's bad faith

claim. (ECF 11). By Order of September 26, 2022, this Court granted Progressive's motion for partial summary judgment. (ECF 12). Thereafter, the parties agreed to waive any rights to a jury trial. The then remaining issues were the breach of contract and damages claims.

Just prior to the bench trial, the parties stipulated to liability, leaving only the issue of damages. At the trial, Plaintiff presented testimony and evidence through two witnesses: Ms. Rodd (Plaintiff) and Danielle La Rue (one of Plaintiff's former supervisors). Defendant did not present any witnesses. Both sides moved for the admission into evidence without objection of various exhibits, including each party's various expert reports. At the close of the trial, the parties were directed to file their respective proposed findings of fact and conclusions of law and any responses thereto. (ECF 49).

Plaintiff filed her proposed findings of fact and conclusions of law which were directed primarily at the scope of Plaintiff's damages, the only trial issue. (ECF 50). Progressive submitted proposed findings of fact and conclusions of law directed at the legal issue previously and repeatedly decided against Progressive prior to trial, *i.e.*, Progressive's waiver of affirmative defenses premised on policy exclusion, as well as Plaintiff's injuries and damages. (ECF 51). Plaintiff thereafter filed supplemental proposed findings of fact and conclusions of law that responded to those submitted by Progressive. (ECF 53). Notably, Progressive did not file any response to Plaintiff's initial proposed findings of fact and conclusions of law. (ECF 52).

**APPLICABLE STANDARD**

Rule 52 provides that in an action tried on the facts without a jury, the court must find the facts specifically and state its conclusions of law separately. Fed. R. Civ. P. 52(a)(1). "The findings or conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court." *Id.* Since this is a civil case,

Plaintiff has the burden of proving her claims by a preponderance of the evidence. *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 (1983).

**FINDINGS OF FACT**[1]

Based on the testimony during the trial, assessing the credibility of the witnesses, and considering the parties' post-trial submissions, this Court finds that the following facts were proven by a preponderance of evidence:

1. This matter is an underinsured motorist claim brought by Ms. Rodd against Progressive for injuries Ms. Rodd sustained in a January 4, 2017 motor vehicle accident.

2. At the time of the motor vehicle accident, Ms. Rodd was twenty-three years old, born in 1994, living with her parents, and driving an uninsured vehicle registered to her.

3. Ms. Rodd is seeking underinsured motorist overage benefits under an insurance policy (the "Policy") underwritten to her parents.

4. The Policy provides $300,000 in underinsured motorist benefits, stacked by three vehicles, for a total of $900,000 in underinsured motorist benefits. (*See* Def. Notice of Removal, ECF 1, at ¶ 29 n.2).

5. The parties stipulated to liability.

6. From the site of the motor vehicle accident, Ms. Rodd was taken by ambulance to the emergency room at St. Luke's Hospital where imaging showed comminuted displaced interarticular fractures of the right lower leg and right ankle. She was admitted for a fracture reduction and stabilization with the placement of an external fixator. The medical records and expert reports confirm these injuries.

---

[1] These facts are drawn from the parties' submissions, this Court's consideration of the testimony and evidence presented at trial, and the Court's review of the trial transcript.

7. Ms. Rodd's fractures of her right ankle are known as a pilon fracture which involves fractures to a substantial weightbearing area of her right ankle.

8. Ms. Rodd's pilon fracture was diagnosed as a Type III — the most severe type of pilon fracture — meaning it is a complete articular fracture comprised of at least three major components: the medial malleolus, anterior tibial articular fragment with its attachment to the distal fibula, and the posterior tibial articular fragment.

9. Approximately a month after the accident, the external fixator was removed, and Ms. Rodd underwent an open reduction and an internal fixation procedure to stabilize the ankle. This procedure involved inserting plates and screws into the bones of Ms. Rodd's ankle. Three plates and ten screws were permanently placed in the ankle and foot area.

10. Ms. Rodd was kept on non-weight bearing ambulation while the fractures healed. During this time, she used crutches and a wheelchair to ambulate. Weight bearing physical therapy began sometime after April 11, 2017.

11. In May 2017, Ms. Rodd was transferred to a boot and used crutches as needed.

12. After May 2017, Ms. Rodd underwent gait training and physical therapy.

13. Both medical experts, Barry Snyder, M.D. for Plaintiff and Keith Wapner, M.D. for Defendant, agree that Ms. Rodd sustained the pilon fractures as a result of the January 4, 2017 motor vehicle accident. They also agree that Ms. Rodd has developed arthritis in the right ankle, that the condition of her right ankle will deteriorate and worsen over time, and that Ms. Rodd will require future surgeries in the form of either an ankle replacement and/or an ankle fusion surgery.

14. Ms. Rodd testified that she would opt for the ankle replacement procedure to allow for more motion of her ankle joint for the initial surgery which would means that she would most

likely undergo at least two ankle replacement procedures, or an ankle replacement procedure followed by a fusion. The total cost of these procedures is estimated to be $187,427. 00.

15. Ms. Rodd continues to experience sharp pain in her right ankle with intermittent pain that radiates into her right shin. She also experiences numbness from the top of the foot to her small right toe; and her ankle is constantly swollen.

16. Ms. Rodd's right ankle pain and swelling is aggravated when she stands for prolonged periods of time.

17. Prior to the accident, Ms. Rodd worked at a pawnshop, earning approximately $30,000 a year. Subsequent to the accident, Ms. Rodd testified that was unable to tolerate this work due to prolonged standing.

18. Based on the opinions of the parties' respective vocational experts, Ms. Rodd had a pre-accident earning capacity beginning in September 2020, of $34,466 a year.

19. As a result of her right ankle injuries, Ms. Rodd has been limited to working part-time hours. When she has attempted to work longer than part-time, she has been unable to tolerate the aggravation it causes to her right ankle.

20. While working, Ms. Rodd testified that she must take frequent breaks where she has to sit or lay down with her ankle elevated.

21. For a period of time after the accident, Ms. Rodd worked as a cook at a café but was unable to tolerate more than part-time hours. While working at the café, Ms. Rodd had difficulty standing for prolonged periods and had to take frequent breaks to rest her ankle.

22. Ms. Rodd has more recently worked at a camp for three months over the summer as a cook. In this position, she was able to take frequent breaks and was assisted, as necessary, by other workers. This job was seasonal and part-time.

23. She has a minor son who was born in 2019.

24. Both Plaintiff's and Defendant's vocational and medical experts opined that Ms. Rodd can perform light and sedentary work but disagree as to whether Ms. Rodd should be limited only to part-time employment.

25. Based on the experts' opinions, this Court finds Ms. Rodd can perform part-time light to sedentary employment, not to exceed twenty hours per week.

~~26.~~ This Court finds the opinion of Plaintiff's vocational expert and economist, John Dieckman and Andrew Verzilli, useful with respect to Ms. Rodd's future earning capacity assuming she can perform sedentary work. Based upon Ms. Rodd's limitations of part-time employment, these experts calculated that she has a reduced earning capacity of $17,233 annually from her pre-incident earning capacity of $34,466 as a full-time employee. Based on a retirement age of 67, the experts opined that Ms. Rodd would sustain a loss of future earnings of approximately $710,517.00. Adding in benefits and productivity growth per Plaintiff's expert economist, Andrew Verzilli, Ms. Rodd's future loss of earnings capacity would be in the range of $807,355 to $1,041,598. However, this Court finds Defendant expert's, Taylor Pytlik's detailed analysis, more credible, and based on the analysis offered, Ms. Rodd's future loss of earnings capacity would be less than what Plaintiff's experts calculated.

27. Since the accident, Ms. Rodd testified that she has been unable to enjoy her prior hobbies of running and playing sports, such as softball and basketball. She has also been limited in interacting or playing with her child and unable to enjoy her prior hobby of hiking. She is unable to wear certain shoes, such as high heels. She has become depressed and not as happy and outgoing as she had been prior to the accident.

28. Ms. Rodd has scars in her right ankle area, including an approximate six-inch vertical scar from her ankle upward to her shin. She also has two hole-like scars on her upper leg from the external fixator.

29. Ms. Rodd has sustained permanent injuries to her right ankle which her experts have opined will continue to worsen over her lifetime.

30. According to statistics compiled by the United States Department of Health and Human Services, the average remaining life expectancy of all persons of Ms. Rodd's race and age is an additional 52.8 years.

**CONCLUSIONS OF LAW**

Based on the finding of facts expressed, the following are the Court's conclusions of law:

1. The parties stipulated to liability in this insurance coverage matter.

2. Defendant waived any affirmative defense premised on the "household exclusion" as noted in this Court's previous decisions. (*See* ECF 21, 27, and 44).

3. At the time of the underlying motor vehicle accident, the tortfeasor had an insurance policy that carried a bodily injury liability coverage provision limited to $100,000 per person.

4. The tortfeasor's bodily injury policy limit is not adequate to compensate Plaintiff for the injuries she sustained in the motor vehicle accident. As such, at the time of the accident, the motor vehicle that caused the accident was an underinsured motor vehicle, as defined by 75 Pa. Con. Stat. § 1702.

5. At the time of the accident, Ms. Rodd lived with her parents.

6. The injuries and damages Plaintiff suffered as a result of the January 4, 2017 motor vehicle accident are covered by the Policy issued by Defendant to Plaintiff's parents, particularly, the underinsured motorist coverage provision.

7. Underinsured motorist coverage serves the purpose of protecting innocent victims from underinsured motorists who cannot adequately compensate the victims for their injuries.

8. The Policy provides $300,000 in underinsured motorist benefits, stacked by three vehicles, for a total of $900,000 in underinsured motorist benefits. (*See* Def. Not. of Removal, ECF 1, at ¶ 29 n.2).

9. Section 1738 of the Motor Vehicle Financial Responsibility Law ("MVFRL"), 75 Pa. Con. Stat. § 1738, provides that, when multiple vehicles are insured under one or more policies, any UM/UIM coverage is stacked by default.

10. Plaintiff has suffered injuries/damages which will require future medical expenses cost in the amount of $187,427.00.

11. Plaintiff has suffered damages for loss of earnings, loss of earning capacity, and related benefits in the amount of $350,000.

12. Plaintiff has suffered pain and suffering and will continue to suffer damages for pain and suffering in the amount of $50,000.

13. Plaintiff has suffered damages for disfigurement in the amount of $20,000.

14. Plaintiff has suffered damages for embarrassment and humiliation in the amount of $10,000.

15. Plaintiff has suffered damages for loss of life's pleasures in the amount of $10,000.

**CONCLUSION**

For the reasons set forth, this Court finds that Plaintiff has met her burden of showing, by a preponderance of evidence, damages in the total amount of $627,427.00 as a result of the January

4, 2017 motor vehicle accident, and that said losses are recoverable under the underinsured motorist coverage provision of the Policy.  An Order consistent with these findings will be issued.

*NITZA I. QUIÑONES ALEJANDRO*, J.